IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANITA F. RUSHING,
               Plaintiff,

                                              CV 07-1124-PK

                                              FINDINGS AND
v.                                            RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,
               Defendant.

_____

PAPAK, Magistrate Judge:

      Plaintiff Anita F. Rushing filed this action August 1, 2007, seeking judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act").  This court has jurisdiction over Rushing's action pursuant to 42 U.S.C. § 405(g).

      Rushing's appeal is now before the court.  Rushing argues that the Commissioner failed properly to assess her residual functional capacity after completing step three of the five-step

Page 1 - FINDINGS AND RECOMMENDATION

sequential process for analyzing a Social Security claimant's entitlement to benefits, and failed to

carry his burden at step five of the process.  I have considered all of the parties' briefs and all of

the evidence in the administrative record.  For the reasons set forth below, the Commissioner's

decision should be affirmed.

### DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected . . . to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has

established a five-step sequential process for determining whether a claimant has made the

requisite demonstration.  *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§

404.1520(a)(4).  At the first four steps of the process, the burden of proof is on the claimant;

only at the fifth and final step does the burden of proof shift to the Commissioner.  *See Tackett v.*

*Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if

any.  *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i).  If the ALJ finds that

the claimant is engaged in substantial gainful activity, the claimant will be found not disabled.

*See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).  Otherwise,

the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.

*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii).  An impairment is

"severe" if it significantly limits the claimant's ability to perform basic work activities and is

Page 2 - FINDINGS AND RECOMMENDATION

expected to persist for a period of twelve months or longer.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(c).  The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b); *see also Bowen*, 482 U.S. at 141.   If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).  If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record.  *See* 20 C.F.R. §§ 404.1520(e).  The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments.  *See* 20 C.F.R. § 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

---

[1]  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.*" Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Rushing was born June 11, 1968. Tr. 104.[2] On December 1, 2000, she filed an application for Title II disability insurance benefits, Tr. 104-107, with a previous "protective" filing date of November 2, 2000, Tr. 90, 107. In her DIB application, Rushing alleged a disability onset date of July 15, 1995, Tr. 104; Rushing subsequently amended her alleged disability onset date, as set forth below.

In her DIB application, Rushing described her allegedly disabling condition as a problem involving a slipped vertebra that causes "severe pain" in her back and down her legs and hips if she attempts to stand for "any amount of time." Tr. 115. Rushing's back pain evidently began in

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 11.

October 1994, Tr. 175, 177-178, and she continued to seek treatment for her condition through at least July 2006, Tr. 504. During that same period, she also repeatedly sought medical treatment for abdominal pain, Tr. 204, 227, 229, 230, 247-248, 249, 250, 251, 252, 253-254, 258-259, 262, 295, 296, 335, 346, 359, 331-332, 333, 336, 337-338, 342-343, 350, headaches, Tr. 207-209, 227, 228, 235-236, 344, 346, insomnia and fatigue, Tr. 227, 228, 235-236, swelling in her hands and feet, Tr. 204, 205, 206, 207-209, 210, 211, 213, 215-216, 227, 228, 230, 232, 321-322, 323-324, 342-343, and mild depression, Tr. 229, 235-236, 346. Rushing completed the tenth grade, and did not earn a General Educational Development credential or complete any kind of vocational training. Tr. 48, 121, 528. Rushing has worked in the past as a cannery worker, delicatessen worker, and state hospital kitchen worker. Tr. 116, 129-135.

Rushing's DIB application was denied both initially on February 23, 2001, Tr. 92-95, and on reconsideration on July 26, 2001, Tr. 98-100. Rushing subsequently requested a hearing before an Administrative Law Judge to appeal the Administrationr's adverse decision. Tr. 422-423.

On October 21, 2003, an appeal hearing was held before an ALJ. Tr. 40-89. At that hearing, Rushing, through her counsel, orally amended her DIB application to allege a disability onset date of May 1, 1999, rather than of July 15, 1995. Tr. 21, 26, 46-47, 444. It appears that the May 1, 1999, date was selected not because any cognizable change in Rushing's medical condition occurred at or around that time, but rather because, given the date Rushing's DIB application was filed, that was the earliest date for which Rushing could expect to receive benefits. Tr. 21, 46-47, 444. The ALJ heard testimony from Rushing, Tr. 47-74, her husband, Tr. 75-80, and a vocational expert, Tr. 80-88.

Page 6 - FINDINGS AND RECOMMENDATION

On December 16, 2003, the ALJ issued a decision finding that Rushing was not disabled. Tr. 20-28. The ALJ noted that Rushing was insured for disability benefits only through December 31, 2000, and that to qualify for benefits she therefore needed to establish that she was disabled for purposes of the Act on or before that date. Tr. 21. At step five of the five-step sequential evaluation process, the ALJ found that Rushing retained the residual functional capacity to perform a "reduced range of sedentary exertional level work," including sedentary assembler, addresser, and food order clerk. Tr. 25-26, 27-28. On this basis, the ALJ concluded that Rushing was not disabled. Tr. 26, 28.

Rushing timely requested administrative review of the ALJ's decision, and on January 31, 2005, the Appeals Council declined her request. Tr. 6-9. In consequence, the ALJ's decision became the Commissioner's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also*, *e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000). Rushing therefore requested judicial review of that final order denying disability insurance benefits.

On April 27, 2006, Judge Hogan reversed the Commissioner's final decision, and remanded the case for further proceedings. Tr. 458-461. Specifically, Judge Hogan found that the ALJ had improperly disregarded medical and lay opinion evidence that Rushing suffered from arthritis or a related condition, and that this evidence could have impacted the ALJ's assessment of Rushing's credibility. Tr. 458-459.

On November 7, 2006, a second hearing was held in front of a new ALJ. Tr. 521-536. The ALJ heard Rushing's testimony, Tr. 525-527, and the testimony of a new vocational expert, Tr. 527-535. Subsequently, on March 27, 2007, the second ALJ issued an opinion finding that Rushing was not disabled within the meaning of the Act from July 15, 1995, through her date

Page 7 - FINDINGS AND RECOMMENDATION

last insured.[3]  Tr. 444-457.  Specifically, at step five of the five-step sequential evaluation process, the ALJ found that Rushing retained the residual functional capacity to perform unskilled "light exertional level activities," including surveillance system monitor, cashier, and assembler.  Tr. 450-456.  On this basis, the ALJ concluded that Rushing was not disabled.  Tr. 456.

Rushing again timely requested administrative review of the ALJ's decision, and on June 12, 2007, the Appeals Council declined her request.[4]  Tr. 413-416.  The ALJ's decision of March 27, 2007, therefore became the Commissioner's final order for purposes of judicial review.  *See* 20 C.F.R. § 422.210(a); *see also*, *e.g.*, *Sims*, 530 U.S. at 107.  This action followed.

SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found in his March 27, 2007, opinion that Rushing did not engage in substantial gainful activity at any time between her alleged disability onset date of May 1, 1999 (or indeed her initially alleged disability onset date, nearly four years earlier), and her date last insured of December 31, 2000.  Tr. 447.  He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that during the relevant period between her alleged

---

[3]  Indeed, the ALJ incorrectly determined Rushing's last day of coverage for disability insurance benefits to be December 31, 2001, and found that she was not disabled through that date, one full year following her actual date last insured.  Tr. 445.

[4]  The Appeals Council opined that two of the jobs cited by the ALJ and vocational expert, cashier and assembler, could not be performed by a claimant with the residual functional capacity established for Rushing by the ALJ.  Tr. 414.  However, the Appeals Council nevertheless declined to assume jurisdiction over the ALJ's decision, because it concluded that the remaining job cited, surveillance system monitor, existed in significant numbers in the national economy and could be performed by a claimant with Rushing's residual functional capacity as established by the ALJ.  Tr. 414-415.

disability onset date and her date last insured, Rushing's medical impairments of lumbar

degenerative disc disease, obesity, irritable bowel syndrome, and probable idiopathic edema

were "severe" for purposes of the Act.  Tr. 447.  The ALJ further found that evidence for the

diagnosis of arthritis was minimal, and that evidence in the record supported the conclusion that

Rushing's impairment from arthritis, if any, was not severe; that the evidence showed no

indication of persistent hypertension, headaches, or depression; and that the evidence supporting

Rushing's recent diagnoses of fibromyalgia and gallstones did not suggest that those conditions

had been present prior to her date last insured.  Tr.  447-448.  Because some of Rushing's

impairments were deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Rushing's impairments was the equivalent of

any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  Tr.  448-449.  The ALJ

therefore properly conducted an assessment of Rushing's residual functional capacity.

Specifically, the ALJ found that:

> through the date last insured, the claimant had the residual functional capacity for
> light exertional level activities, with the ability to lift, carry, sit, stand, and walk
> consistent with this residual functional capacity, except for specific limitations.
> The limitations include the need to sit or stand at will; no frequent flexing or
> extension of the wrists; no frequent fine manipulation with the hands; and
> climbing ropes, as well as crawling, is precluded.  Work breaks are those
> normally associated with an 8 hour a day job.

Tr. 450.  In reaching these conclusions, the ALJ properly considered all of the objective medical

evidence in the record, as well as Rushing's own statements and the statements of her husband

and mother as to her ability to perform the activities of daily living, the frequency and intensity

of her pain and other symptoms, and the efficacy both of medical treatment and of other

measures taken to alleviate her symptoms.  Tr. 450-455.

Page 9 - FINDINGS AND RECOMMENDATION

At the fourth step of the five-step process, the ALJ found in light of her RFC that as of her date last insured, Rushing was unable to perform her past relevant work.  Tr. 455.

At the fifth step, the ALJ found in light of Rushing's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that she could have performed as of her date last insured.  Tr. 456.  Relying in part on the testimony of an objective vocational expert at the November 2006 hearing, the ALJ cited as examples of unskilled light-exertional jobs that Rushing could have performed despite the limitations listed in her RFC jobs including surveillance system monitor, cashier, and assembler. Tr. 456.  Based on the finding that Rushing could have performed jobs existing in significant numbers in the national economy, the ALJ concluded that she was not disabled as defined in the Act at any time between July 15, 1995, and December 31, 2001, including the entirety of the time period at issue here (May 1, 1999, through December 31, 2000).  Tr. 456.

## ANALYSIS

Rushing challenges the Commissioner's assessment of her residual functional capacity. Specifically, Rushing argues that the Commissioner improperly rejected the opinion of her treating physician, Dr. Patricia Weeks, and the lay opinion testimony offered by Rushing and her husband when he concluded that, as of her date last insured, December 31, 2000, she was capable of light exertional level activities on a regular and continuing basis.

Rushing further argues that the Commissioner failed to carry his burden at the fifth step of the five-step process in light of the alleged errors in his assessment of Rushing's RFC, by framing an allegedly inapposite hypothetical to the vocational expert, by finding that more surveillance system monitor jobs exist in the national economy than the evidence suggests, and

by failing to inquire of the vocational expert whether his testimony was consistent with the information contained in the Dictionary of Occupational Titles.

I.     **Residual Functional Capacity**

A.     **Opinion of Dr. Weeks**

Patricia Weeks was Rushing's treating physician for back pain and other issues from July 1996, Tr. 240, through at least July 2006, Tr. 497.  On October 14, 2003, she provided a Medical Source Statement in which she stated that over the course of a regular eight-hour work day Rushing needed more rest, in addition to a morning break, a lunch period, and an afternoon break, in order to relieve her pain and fatigue symptoms.  Tr. 388.  Dr. Weeks specified that Rushing needed a cumulative total of two hours rest in a supine position during an eight-hour work day.  Tr. 388.  She further opined that Rushing could only sit for one continuous hour at a time without alternating postures or moving, but could sit for a cumulative period in excess of six hours during an eight-hour work day.  Tr. 388-389.

In the Medical Source Statement, Dr. Weeks further opined that Rushing could only stand or walk continuously for a period not to exceed 30 minutes, and cumulatively for less than an hour per day.  Tr. 389.  She stated that Rushing could rarely or never lift 11-20 pounds, could occasionally lift 6-10 pounds, and could frequently lift 1-5 pounds.  Tr. 389.  She opined that Rushing could occasionally balance while standing or walking on level ground, but could rarely or never stoop by bending her spine at her waist.  Tr. 389.  She stated that Rushing's "limiting symptom" is pain, characterized as "constant" and as "limit[ing] her activities."  Tr. 389.  The Statement bears Dr. Weeks' handwritten notation that Rushing was, continuously from May 1, 1999, through October 14, 2003, "not able to work."  Tr. 390.

Page 11 - FINDINGS AND RECOMMENDATION

Rushing argues that the Administrative Law Judge improperly rejected Dr. Weeks' Medical Source Statement in finding that she "had the residual functional capacity for light exertional level activities, with the ability to lift, carry, sit, stand, and walk consistent with this residual functional capacity," Tr. 450.

In weighing a claimant's medical evidence, the Commissioner generally affords enhanced weight to the opinions of the claimant's treating physicians. *See* 20 C.F.R. § 404.1527(d)(2). Indeed, where a treating physician's medical opinion is well supported by diagnostic techniques and is not inconsistent with other substantial evidence in the medical record, the treating physician's opinion is accorded controlling weight. *See id.* Moreover, even where a treating physician's opinion is contradicted by competent medical evidence, it is still entitled to deference. *See id.*; *see also*, *e.g.*, *Orn v. Astrue*, 495 F.3d 625, 631-632 (9th Cir. 2007) (where a treating physician's opinion is contradicted by medical evidence in the record it is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527"), *quoting* S.S.R. No. 96-2p, 1996 SSR LEXIS 9. In consequence, an uncontradicted treating physician's opinion may only be rejected for "clear and convincing" reasons supported by evidence in the record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Notwithstanding the foregoing, no such deference is afforded a treating physician's opinion as to the ultimate issue of a claimant's disability or as to any other issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also* S.S.R. No. 96-5p, 1996 SSR LEXIS 2.

Here, the ALJ specifically considered Dr. Weeks' October 14, 2003, Medical Source

Statement in assessing Rushing's residual functional capacity. Tr. 452-453. However, he

rejected some of the limitations identified therein as contradicted by objective findings reported

by specialists to whom Dr. Weeks referred Rushing for evaluation, and by more

contemporaneous medical records maintained by Dr. Weeks herself. Tr. 453-455. The ALJ

noted that rheumatologist Charles May, M.D., to whom Dr. Weeks referred Rushing in July 1999

for the diffuse swelling she was experiencing in her hands and feet, Tr. 215-216, and who

examined Rushing on multiple occasions in 2000 and 2002, at no time identified any impairment

in Rushing's hand functioning or any symptom of arthritic pain. Tr. 453; *see also* Tr. 204, 205,

206, 207-209, 210, 211, 212, 213, 214, 215-216, 323-324.

Dr. Weeks also referred her patient to neurologist Jerry Hubbard, M.D., who first met

with Rushing on December 28, 2000, just three days prior to her date last insured, Tr. 285-287,

and who continued to examine her through at least August 2002, Tr. 313. In connection with his

initial consultation, Dr. Hubbard described Rushing to Dr. Weeks as "appear[ing] to be in mild

discomfort, slightly anxious" and as "able to rise up and walk without major discomfort." Tr.

286. The ALJ noted that in January 2001, shortly after Rushing ceased to be covered for DIB

purposes, Dr. Hubbard concluded that Rushing's "symptoms [we]re mainly subjective; no major

objective findings on exam to indicate disability," and that she had no pitting edema and no

likely focal herniation. Tr. 453; *see also* Tr. 314. On January 31, 2001, a bone scan ordered by

Dr. Hubbard came back with "no evidence of facet arthropathy," and with the L5-S1 level of

Rushing's spine appearing "grossly normal." Tr. 317. On February 8, 2001, Dr. Hubbard

reviewed the bone scan with Rushing and her family, noting that her symptoms had "[n]o

obvious anatomic cause" that he could identify. Tr. 314. Dr. Hubbard recommended pain

Page 13 - FINDINGS AND RECOMMENDATION

management counseling, stating that he had "nothing else to offer." Tr. 314.  The ALJ further

noted that Dr. Hubbard's conclusions of July 2002, over a year later, were entirely consistent:

Dr. Hubbard described Rushing as "appear[ing] to be in moderate discomfort," with negative

results for all testing to determine the cause of her reported pain symptoms.  Tr. 453-453; *see*

*also* Tr. 309-311.  Dr. Hubbard noted that Rushing had disregarded his recommendation that she

participate in a pain management program, and repeated his earlier counsel that she do so.  Tr.

310.  The ALJ further noted that Dr. Hubbard identified no significant "limitations, deficits, or

abnormalities" in Rushing's ability to function.  Tr. 454.

       The ALJ also noted that Rushing's medical records from 1994 indicate back problems

caused by lifting trays at work, as well as poor posture and body mechanics.  Tr. 454; *see also*

Tr. 175-178.  The ALJ noted that shortly thereafter, Rushing married, became pregnant, and

voluntarily left the workforce[5] as of July 15, 1995, her originally alleged date of onset of

disability.  Tr. 454.  The ALJ expressly noted that "[t]here is no indication in the detailed

medical record that she left the workforce due to any documented medical reason. . . ."  Tr. 454.

       The ALJ further noted that Dr. Weeks' own contemporaneous reports undercut her later-

expressed opinion of total disability.  As noted by the ALJ, on June 2, 1999, Dr. Weeks reported

that Rushing "is on her feet all day," despite the pain in her back, legs, and feet.  Tr. 454; *see*

*also* Tr. 232.  He further noted that Dr. Weeks' records show uniformly negative results

_____

       [5]  Rushing characterizes her departure from the workforce thus:

       I Left work for two Reason.  It got harder & harder to fulfill my duties there were
       no other job for me to do.  I missed Alot [*sic*] of work.  Then I got married and
       my husband & I decided to Leave my job.

Tr. 115.

Page 14 - FINDINGS AND RECOMMENDATION

regarding identification of any cause for Rushing's various symptoms, and no contemporaneous

suggestion of impairment.  Tr. 454-455.

Finally, the ALJ found it significant that Rushing left the workforce following the

complication-free birth of her child rather than in connection with a medically significant change

in her condition, that she made no attempt to re-enter the workforce following her voluntary

departure from it, and that she never sought vocational rehabilitation or responded to the advice

of medical caregivers to engage in physical therapy or pain management counseling.  Tr. 455.

The ALJ also found it significant that despite alleged pain symptoms so severe that she is unable

to function, she manages her home, cares for her family, and successfully home-schools her child

rather than take advantage of available public education.  Tr. 455.  Moreover, the ALJ noted,

Rushing's mother's report suggests that Rushing was not so impaired as to be unable to function.

Tr. 455; *see also* Tr. 147-158.  The ALJ concluded that these observations constituted "subtle

indicators of a chosen lifestyle, not one forced by medical factors."  Tr. 455.

As set forth above, the ALJ identified specific, legitimate reasons for rejecting Dr.

Weeks' contradicted October 14, 2003, Medical Source Statement as inconsistent with more

contemporaneous and objective evidence.  The ALJ's conclusions are supported by evidence in

the record, and were made in accordance with proper legal standards.  His rejection of Dr.

Weeks' opinion as expressed in the Medical Source Statement should therefore not be disturbed.

**B.    Rushing's Testimony**

On January 10, 2001, within two weeks after her date last insured, Rushing filled out a

"Claimant Pain Questionnaire," Tr. 144-146, and an "Activities of Daily Living and

Socialization" form, Tr. 137-143, in which she reported "constant" pain in her lower back and

legs that was exacerbated by activity of any kind and relieved by rest with elevated feet, Tr. 144.

She indicated that she could be active for an hour before needing rest, Tr. 145, that she could and

did take occasional short walks, Tr. 146, that she could and did groom herself without assistance,

Tr. 137, 146, that she could and did clean her home, laundry, and dishware daily without

assistance, albeit with breaks, Tr. 138, 146, that she could and did frequently drive her car to

visit friends and family, Tr. 146, that she could and did engage in some hobbies for 30 minutes at

a stretch, or ten minutes at a stretch for activities like sewing, which caused hand cramps, Tr.

140, 146, and that she could and did prepare meals for herself and for her family, Tr. 138, 146.

　　　　Nearly three years later, at her first hearing before an Administrative Law Judge on

October 21, 2003, she testified that she had recently started home-schooling her daughter from

9:00 am to 2:30 pm five days per week, during which time she would sit with her feet in an

elevated position.  Tr. 53-56.  She testified that she needed to take frequent breaks due to pain,

but also testified that "the hurting is not a big deal" because she could "take a lot of pain."  Tr.

69-70.  She indicated that the homeschooling was usually preceded by a period of housework

that began around 7:00 am.  Tr. 54.

　　　　At that same hearing, she testified that she was still cooking meals for the family

approximately 20% of the time, Tr. 57-58, but that her husband did most of the shopping because

her medications did not permit her to do much driving and because she couldn't walk very far in

the store "without hurting or something," Tr. 58.  She testified that she could sew, but for only

five minutes at a time without pain; she indicated that this had been the case for "five or ten

years."  Tr. 60, 71.

　　　　She further testified on October 21, 2003, that she did not have the endurance for a

Page 16 - FINDINGS AND RECOMMENDATION

normal working schedule of eight hours a day with two rest breaks plus a half hour for lunch, indicating that the limiting factor was "just getting there. . . I don't think I could get up to get there." Tr. 72. She indicated that she was unable to sit or stand still for extended periods, Tr. 73, and that while she could lift a gallon of milk without difficulty, she generally would leave carrying more than that to her husband, Tr. 74.

Rushing argues that the ALJ improperly rejected her testimony when he established her RFC. In fact, the ALJ expressly found that Rushing's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." Tr. 452.

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms. 20 C.F.R. § 404.1529. In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between her testimony and her conduct, claimant's daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." *Id.* (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997). While a finding that a claimant lacks credibility cannot be premised solely on a

Page 17 - FINDINGS AND RECOMMENDATION

lack of medical support for the severity of her pain, *see Light*, 119 F.3d at 792, *citing Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), where the ALJ's credibility finding is supported by substantial evidence in the record, the finding will not be disturbed, *Thomas*, 278 F.3d at 959, *citing Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

Here, the ALJ provided specific, clear, and convincing reasons for rejecting Rushing's self-report of the severity of her impairments. First, the ALJ found that Rushing's mother, who on January 8, 2001 – just over one week following Rushing's date last insured – filled out a "Third Party Information on Activities of Daily Living and Socialization" form, "describe[d] a functional level higher than that alleged by the claimant or her spouse," one "consistent with multiple descriptions of the claimant in the medical record as being a housewife and mother." Tr. 452; *see also* Tr. 147-158. Specifically, Rushing's mother reported that Rushing drove her car one to four times weekly and could do so safely and in unfamiliar places, Tr. 150, took short walks once or twice per week, Tr. 151, performed housework and yardwork, Tr. 151, 157, played catch with her daughter, Tr. 152, gardened, sewed, and did arts and crafts, Tr. 152, prepared homemade meals on a daily basis for herself and her family, Tr. 153, cleaned up after meals, Tr. 153, did the laundry, dusted, and took out the trash on a daily basis, sometimes with help from her husband, Tr. 154-155, supervised and cared for her daughter, Tr. 155, 157, and fed and cared for the household's pets, including two goats and a horse, Tr. 155.

Second, the ALJ noted that, despite alleged pain symptoms of sufficient severity to prevent her performing light exertional duties, Rushing was able to manage her home, care for her family, and successfully home-school her daughter rather than avail herself of public education. Tr. 455.

Third, the ALJ found Rushing's testimony not entirely credible in light of the facts that she left the workforce following the complication-free birth of her child rather than in connection with a medically significant change in her condition, that she made no attempt to re-enter the workforce following her voluntary departure from it, and that she never sought vocational rehabilitation or responded to the advice of medical caregivers to engage in physical therapy or pain management counseling.  Tr. 455.

The ALJ's credibility determination is supported by substantial evidence in the record and was made pursuant to proper legal standards.  This court therefore should not disturb his finding that Rushing's self-report of the severity of her impairments was not entirely credible.

### C.    Lay Opinion Testimony of Rushing's Husband

At the October 21, 2003, hearing, the Administrative Law Judge heard Rushing's husband Michael testify as to Rushing's impairments and limitations.  Tr. 75-79.  Michael reported that as of October 2003, Rushing "ha[d] to sit down a lot" and "ha[d] a hard time standing."  Tr. 75.  He specified that when Rushing sat, it was with her feet elevated rather than in a typical "work posture."  Tr. 76.  He further testified that Rushing had difficulty using her hands, including experiencing pain and observable swelling while sewing or washing dishes.  Tr. 75, 76-77.  He indicated that Rushing needed to use the bathroom frequently, at unpredictable intervals.  Tr. 79.  He indicated his belief that Rushing's medications had not made any significant difference in her condition.  Tr. 77.

Michael also testified that Rushing experienced depression "very often," and that her susceptibility to depressive episodes had persisted since before her date last insured.  Tr. 77-78.  He further indicated his belief that, due to her pain symptoms, Rushing had been unable to

Page 19 - FINDINGS AND RECOMMENDATION

"maintain a work pace since '99."  Tr. 78.

Rushing argues that the ALJ improperly rejected Michael's testimony in assessing her

residual functional capacity.  "An ALJ need only give germane reasons for discrediting the

testimony of lay witnesses."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), *citing*

*Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  Inconsistency with medical evidence is

considered a "germane" reason for discrediting lay witness testimony.  *See id.*, *citing Lewis*, 236

F.3d at 511.

Here, the ALJ expressly considered Michael's testimony at some length.  Tr. 451-452.

The ALJ noted that the bulk of Michael's testimony was inapposite, relating to Rushing's

capacities as of October 2003 rather than as of the period between her alleged disability onset

date of May 1, 1999, and her date last insured of December 31, 2000.  Tr. 451.  He further noted

that although Michael described Rushing as experiencing difficulty in using her hands, he also

described multiple activities engaged in by Rushing that require intensive use of hands.  Tr. 451.

The ALJ also found it noteworthy that Michael failed to explain Rushing's success in

maintaining a household and educating her daughter in light of his opinion that she was

incapable of working a job.  Tr. 451.

Perhaps more critically, the ALJ noted that Michael's testimony was in conflict with

medical evidence in the record in at least two respects:  the medical record establishes that at

least some of Rushing's symptoms have responded well to medication, Tr. 452, *see also* Tr. 204,

205, 206, 207, 212, 228, 229, and the medical record contains evidence that Rushing had

"excellent range of motion of her shoulders, elbows, wrists, and the small joints of her hands,"

Tr. 452, *see also* Tr. 208, and could "rise up and walk without major discomfort" and "walk fully

Page 20 - FINDINGS AND RECOMMENDATION

on her heels and toes" Tr. 452, *see also* Tr. 286.

Finally, the ALJ noted that Michael's testimony was contradicted by the report provided by Rushing's mother, which indicated a functional level higher than that described by Rushing or her husband.  Tr. 147-158, *see also* discussion, *supra*.

To the extent the ALJ discredited portions of Michael's testimony, he provided germane reasons for so doing that are supported by substantial evidence in the record.  This court therefore should not disturb his finding that Michael's testimony was not entirely credible.

## II.    Step Five:  Existence of Jobs the Claimant Could Perform in the National Economy

At the November 7, 2006, hearing, the Administrative Law Judge presented a hypothetical question to the testifying vocational expert in which he described a 32-year-old female with a 10th grade education and no transferable job skills, limited to light exertional work and lifting, limited to jobs in which she could sit or stand at will, and limited in wrist extension and flexion and in fine manipulation to 50% of work time.  Tr. 529.  He specified that the hypothetical individual could not use ropes or ladders, could not climb or crawl, and needed breaks of fifteen to thirty minutes every two hours.  Tr. 529.  In response to this hypothetical, the vocational expert responded that the described limitations "would limit the [hypothetical individual's] work activities to something such as a surveillance system monitor."  Tr. 530.  The ALJ next presented the vocational expert with a second hypothetical, identical to the first except that the individual would be limited to not more than "frequent" wrist extension and flexion and fine manipulation.  Tr. 531.  The vocational expert identified assembly jobs, packaging and sorting jobs, and cashiering jobs as among those the hypothetical individual would be able to perform under those limitations.  Tr. 531.  In response to a third hypothetical, identical to the

second except that the individual would be limited to lifting not more than ten pounds, the
vocational expert indicated that none of the jobs previously identified would be foreclosed by the
addition of the lifting restriction.  Tr. 531.  In response to questioning by Rushing's counsel, the
vocational expert indicated that any of the identified jobs would permit the individual to take
unscheduled restroom breaks and to elevate her feet while sitting.  Tr. 532-533.

The vocational expert testified that more than 600 surveillance system monitoring jobs
existed in Oregon, as well as more than 60,000 nationwide, and that more than 500 assembly,
packaging and sorting, and cashiering jobs existed in Oregon as well as more than 50,000
nationally.  Tr. 530, 531.

Based on the vocational expert's testimony, the ALJ found that Rushing could perform
the essential duties of jobs existing in significant numbers in the national economy.  Tr. 456.
The ALJ specifically found that the vocational expert's testimony was consistent with the
information contained in the Dictionary of Occupational Titles ("D.O.T."), Tr. 456; however, the
ALJ did not expressly inquire of the vocational expert whether his testimony was consistent with
the D.O.T.  In listing examples of appropriate, unskilled, light-exertional level occupations
within Rushing's capabilities, the ALJ erroneously stated that there existed 600 surveillance
system monitor jobs in the state and 600,000, rather than 60,000, in the nation as a whole.  Tr.
456.

In its review of the ALJ's decision, the Appeals Council stated that the occupations listed
by the vocational expert in response to the ALJ's second hypothetical required hand usage in
excess of the limitations identified by the ALJ in his assessment of Rushing's residual functional
capacity.  Tr. 414.  However, the Appeals Council specifically found that the surveillance system

Page 22 - FINDINGS AND RECOMMENDATION

monitor job required an ability to flex and extend the muscles of the hands only 11-33% of the time, and on that basis declined to disturb the ALJ's decision.  Tr. 414-415.

## A.    Alleged Errors in Residual Functional Capacity Assessment

Rushing argues that the Commissioner failed to carry his burden at the fifth step of the five-step process because the Administrative Law Judge's assessment of her residual functional capacity failed to set forth limitations requiring more frequent rest breaks than required by Oregon wage and hour law, stating her inability to stand for the time necessary to perform light exertional work, stating her inability to lift the amount necessary to perform light exertional work, stating her inability to bend, stoop, or balance, stating her inability to use her hands, and requiring ready access to a bathroom.  However, as set forth in Section I, *supra*, the ALJ's decision to reject the evidence underlying these putative limitations should not be disturbed.  The ALJ's assessment of Rushing's RFC is therefore supported by substantial evidence in the record, and was made in accordance with proper legal standards.  The ALJ's decision should therefore not be disturbed on the basis of his assessment of Rushing's RFC.

## B.    Hypothetical Question Posed to Vocational Expert

Rushing argues that the first hypothetical question posed to the vocational expert failed to incorporate all of her relevant limitations.  Specifically, she appears to argue that the limitation to 50% wrist extension and flexion and 50% fine manipulation is not consistent with the Administrative Law Judge's assessment of her residual functional capacity, which should have foreclosed any occupation requiring "frequent" (defined as 1/3 to 2/3 of the time) use of hands and wrists, Tr. 450.

Although the ALJ's phrasing of the hypothetical was inartful at best, and created the

potential for harmful error by leaving open the possibility that the vocational expert would identify occupations requiring use of hands in excess of 33% of the time, in fact the error here was harmless.  In response to the first hypothetical, the vocational expert identified only the occupation of surveillance system monitor, Tr. 530, a position which does not require frequent manual manipulation of any kind, *see* D.O.T. 379.367-010.  Thus a properly articulated hypothetical would have produced the same response as did the hypothetical actually posed; moreover, all of the job duties of a surveillance system monitor are within Rushing's capabilities as set forth in her RFC.  The Commissioner's decision should therefore not be disturbed on the basis of the hypothetical posed to the vocational expert.  *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("[a] decision of the ALJ will not be revered for errors that are harmless"), *citing Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991).

### C.     Number of Surveillance System Monitor Jobs Existing in National Economy

Rushing notes, correctly, that the Administrative Law Judge erred in finding that 600,000 surveillance-system monitor jobs existed in the national economy in light of the vocational expert's testimony that only 60,000 such jobs existed.  However, the existence of 60,000 such jobs is sufficient to support the conclusion that Rushing could perform the functions of jobs existing in significant numbers in the national economy.  *See*, *e.g.*, *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. Cal. 1995) (64,000 jobs existing nationwide sufficient to support a finding of no disability); *Barker v. Secretary of Health & Human Services*, 882 F.2d 1474, 1479 (9th Cir. 1989) (suggesting that fewer than 500 jobs in the regional economy could suffice to support a finding of no disability).  The ALJ's error, apparently typographical in nature, was therefore harmless.  As noted above, "[a] decision of the ALJ will not be revered for errors that are

harmless." *Burch*, 400 F.3d at 679, *citing Curry*, 925 F.2d at 1131.

    **D.**    **Failure to Inquire Whether Vocational Expert's Testimony was Consistent with the Dictionary of Occupational Titles**

Rushing notes, correctly, that the Administrative Law Judge failed to inquire of the vocational expert whether his testimony was consistent with the information contained within the Dictionary of Occupational Titles.  Pursuant to Social Security Ruling 00-4p, to which this court owes a degree of deference, *see Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006):

> When a [vocational expert] provides evidence about the requirements of a job or occupation, the adjudicator has an **affirmative responsibility** to ask about any possible conflict between that [vocational expert's] evidence and information provided in the DOT.  In these situations, the adjudicator **will**:
>
> > Ask the [vocational expert] if the evidence he or she has provided conflicts with information provided in the DOT; and
> >
> > If the [vocational expert's] evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

S.S.R. 00-4p, 2000 SSR LEXIS 8, 8-9 (SSR 2000) (emphasis supplied).

The Ninth Circuit has held that such failure to inquire can, where there is an actual conflict between a vocational expert's testimony and the D.O.T., constitute error mandating remand.  *See Massachi v. Astrue*, 486 F.3d 1149, 1153-1154 (9th Cir. 2007).  However, the *Massachi* court also specified that, in the absence of any such conflict, failure to make the required inquiry can constitute harmless error.  *See id.* at 1154, n. 19.  Here, because the vocational expert's testimony was consistent in all respects with the D.O.T., the ALJ's failure to inquire constituted harmless error.  The decision of the Commissioner should therefore not be disturbed on this basis.  *See Burch*, 400 F.3d at 679, *citing Curry*, 925 F.2d at 1131.

**CONCLUSION**

For the reasons set forth above, I recommend that the Commissioner's final decision be affirmed.  A final judgment should be prepared.

**SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due September 22, 2008.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 8th day of September, 2008.

_/s/  Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge